## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

KENNETH BRUMLEY                                    *CIVIL NO. 09-1078

VERSUS                                             *MAGISTRATE JUDGE HILL

LEAM INVESTMENTS, INC., ET AL.                     *BY CONSENT OF THE PARTIES

### REASONS FOR RULING

Pending before the Court is the Motion for Summary Judgement filed by Leam Investments, Inc. ("Leam"), Ronald E. Brumley ("Ronald") and Luann Brumley Holst ("Luann"), collectively, "the defendants." [rec. doc. 51].  Plaintiff, Kenneth Brumley ("Kenneth") has filed Opposition, to which the defendants have filed a Reply.  [rec. docs. 55 and 59].  Oral argument on the Motion was held and the Motion was taken under advisement.

For the reasons which follow, the defendants' Motion for Summary Judgement [rec. doc. 51] is **GRANTED.**  Accordingly, this lawsuit is dismissed with prejudice.

### FACTUAL BACKGROUND

Leam is a family run Louisiana corporation, which was incorporated in 1974 by Ralph Brumley ("Ralph") and Helen Brumley ("Helen"), parents of Kenneth, Ronald, Luann and Frank Brumley ("Frank").  Leam Drilling Systems, Inc. ("Leam Drilling"), is a wholly owned subsidiary of Leam.

Ralph died in April, 2007.  Prior to Ralph's death, Leam's stock was owned as follows: The Ralph Brumley Revocable Trust ("Ralph Trust"), 4,464 shares; The Helen Brumley

Revocable Trust ("Helen Trust"), 4,464 shares; Frank, Ronald, Luann and Kenneth, 150 shares each. The co-trustees of the Ralph Trust were Helen and Kerry Douglas ("Douglas"), a lawyer from Bolivar, Missouri.

In 1983, all shareholders entered into a Buy-Sell Agreement applicable to all sales, assignments and transfers of Leam stock; the Buy-Sell Agreement is inapplicable, however, to *inter vivos* or testamentary transfers to descendants. [rec. doc. 51-1, Ex. A-5, ¶ 1].  The Buy-Sell Agreement was executed "to restrict the transfer of shares of Leam. . . ." [*Id*. at preamble].[1] While the Buy-Sell Agreement does not prohibit the sale or transfer of Leam stock to third persons outside the Brumley family, it is clear that the intent of the Buy-Sell Agreement was to allow the family member shareholders the first right to purchase Leam stock so as to maintain the ownership of the stock within the family.

The Buy-Sell Agreement provides that prior to disposing of any shares, by sale, assignment or transfer to a non-descendant, the selling shareholder must give notice to Leam. [*Id*. at  ¶ 3].  For a period of thirty days, Leam then has the option to buy "any or all of the shares". [*Id*. at ¶ 4 preamble and 4(a)].  In the event that Leam elects not to acquire all of the shares, Leam must send an "Option Notice" to "each of the shareholders who may have the right . . . to purchase, pursuant to the terms of this Agreement, any or all of the shares owned by the selling shareholder. . . ." [*Id*. at ¶ 4].

---

[1]The Buy-Sell Agreement does not differentiate between common and preferred shares of stock, restricting the sale, transfer, etc., of "any shares of stock". [rec. doc. 51-1, Ex. A5, p.2]

2

The preferential right of each shareholder "who ha[s] the right to purchase" may be exercised pursuant to subparagraph (b) as follows: "for a period of fifteen (15) days as to any and all shares that Leam has not theretofore elected to acquire . . . as mutually agreed by *such* shareholders, or in the absence of any agreement by each *such* shareholder in the proportion which the number of shares *then owned* by each such shareholder bears to the aggregate number of shares owned by all such shareholders."  [*Id.* at ¶ 4(b) (emphasis added)].

 "Thereafter, for a period of ten (10) days, as to any or all of the shares that Leam or the shareholders have not theretofore elected to acquire, the preferential right to purchase shall be exercisable by the shareholders who have exercised *in full* such right as provided in the preceding subparagraph (b) as mutually agreed by such shareholders or otherwise in the proportion which the number of shares then owned by *each such shareholder* bears to the aggregate number of shares owned by *all such shareholders (not including any shares owned as a result of the exercise or election to exercise the right to purchase provided in the preceding subparagraph (b) hereof).*" [*Id.* at ¶ 4(c) (emphasis added)].

 "Thereafter, for a period of five (5) days Leam shall have the preferential right to purchase any remaining shares as to which the election to acquire has not heretofore been made." [*Id.* at  ¶ 4(d)].

These rights to purchase are exercised "by giving notice to the selling shareholder . . . stating the number of shares and the purchase price . . ." with a copy of the notice "transmitted to Leam."  [*Id.* at ¶ 4 postscript].

The Buy-Sell Agreement further provides that "[a]ny proposed transfer, sale or other disposition of any shares with respect to which a shareholder's notice of disposition shall have been given and as to which the rights to acquire such shares shall not have been exercised in full as herein provided may be completed at any time within, but not after, ninety (90) days following the expiration of the sixty (60) day period during which Leam and/or any shareholders may exercise the right to acquire such shares." [*Id.* at  ¶ 7].

Prior to Ralph's April 2007 death, Leam's board consisted of all six members of the Brumley family: Ralph, Helen, Frank, Ronald, Luann and Kenneth.  At the annual shareholder meeting held on September 4, 2007, after Ralph's death, Leam's shareholders voted to reduce the size of the board to three directors, electing Helen, Ron and Luann to the three board positions.[2]  Because the majority of Leam's voting stock was owned by the Helen Trust and the Ralph Trust, the deciding votes were cast by Helen as trustee of the Helen Trust and Helen and Douglas, as co-trustees of the Ralph Trust. [rec. doc. 51-1, Ex. A-9].  Effective February 1, 2009, Helen resigned from Leam's board.  Since then, the board has consisted of only Ronald and Luann.

On January 17, 2008, Ronald offered to purchase the 4,464 shares of preferred stock held by the Ralph Trust. [rec. doc. 51-2, Ex. A-13, pg. 24].  A Notice of Intent to sell the shares was sent by co-trustees Helen and Douglas to Leam by letter dated January 31, 2008. [*Id.* at pgs. 22-23].

---

[2]After Ralph's death, until September 4, 2007, the board consisted of the five remaining family members.

4

At a special board meeting held on February 2, 2008, the board, then compromised of Ronald, Helen and Luann, unanimously adopted a resolution "that the corporation shall not exercise its option to purchase the Trust Shares", finding it not in the best interest of Leam to purchase the shares.  [*Id*. at pg. 25].  The board further resolved that "in the event some, but not all, of the shareholders exercise their right to purchase their proportionate portion of the Trust shares, the Corporation shall cause a *second notice* to be sent to the shareholders who have exercised such option, *providing such shareholders* with the option to elect to purchase the portion of the Trust Shares as to which *other shareholders* did not exercise their option." [*Id*. at pg. 26 (emphasis added)].  Leam further resolved that Ronald, as President of Leam "if necessary, send to the shareholders the *second notice* specified in the Buy-Sell Agreement if less than all the shareholders exercise their right to purchase the Trust Shares. . . ."[*Id*. (emphasis added)].

An Option Notice, attaching a copy of the Buy-Sell Agreement, was sent to Kenneth with a copy to his attorney, Helen as trustee of the Helen Trust, Ronald, Frank and Luann on February 5, 2008. [rec. doc. 51-2, Ex. A-13, pg. 1-4].  The Option Notice stated that Leam had the first option to purchase the shares in the Ralph Trust, but that Leam would not exercise its option.  The Option Notice further stated that, pursuant to ¶ 4(b) of the Buy-Sell Agreement, "unless agreed otherwise by all of the shareholders, *each shareholder may purchase a number of shares equal to the proportion which the number of shares then owned by each shareholder bears to the aggregate number of shares owned by all such shareholders*." [*Id*. at pg. 2

5

(emphasis added)].

The *pro rata* number of shares that each shareholder could buy was set forth in a chart included in the Option Notice which specified that Kenneth could buy 132 shares. [*Id*.].  The Notice further stated that "[i]n the event that some, but not all, of the shareholders elect to purchase their proportionate share of the Trust Shares, the Corporation must send a *second notice* to those shareholders who elected to purchase in the first option period, who will, for a period of ten days after the receipt of the notice, have a preferential right to purchase, on a *pro rata* basis, any of the Trust Shares that the shareholders did not elect to acquire in connection with issuance of the first notice." [*Id*. (emphasis added)].

Moreover, the Option Notice provided that "[i]f, after both of the notices have been sent, the shareholders have not elected to purchase all of the Trust Shares, the Corporation has, for a period of five (5) days, the right to purchase any remaining shares." [*Id*. at 3].  Finally, the Option Notice provided that, "If the Corporation and the shareholders elect not to purchase the Trust Shares, in accordance with the Buy-Sell Agreement, the Trust may sell the Trust Shares to Ronald E. Brumley within the time periods specified in the Buy-Sell Agreement." [*Id*.].

None of Leam's shareholders, elected to exercise their right to purchase any of the shares in the Ralph Trust under the Buy-Sell Agreement. [rec. doc. 51-1, Ex. A, ¶ 20]. Accordingly, effective February 28, 2008, apparently, and in accordance with the terms of his January 17, 2008 Offer[3], Ronald purchased all of the 4,464 preferred shares from the Ralph

---

[3]The "Stock Power" presented to this court does not state the sum paid for the shares, but, rather, merely states that the sale was "for value received." [*See* rec. doc. 51-2, Ex. A-14].

6

Trust, making him the majority shareholder owning 4,614 shares. [rec. doc. 51-2, Ex. A-14].

On May 19, 2008, Ronald made an offer to Helen, as trustee of the Helen Trust, to purchase 3,314 shares of preferred stock held by the Helen Trust. [rec. doc. 51-2, Ex. A-15]. By letter dated May 19, 2008, a Notice of Intent to sell the shares was sent by Helen as trustee of the Helen trust to Leam. [rec. doc. 51-2, Ex. A-16].

As was the case with the sale of the shares in the Ralph Trust, at a special board meeting held on May 25, 2008, the board, then compromised of Ronald, Helen and Luann, voted to adopt, with Helen abstaining, a resolution nearly identical to that passed with respect to the shares in the Ralph Trust, that is, that the corporation would not exercise its option to purchase the Trust Shares, finding it not in the best interest of Leam.   [rec. doc. 51-2, Ex. A-17].

An Option Notice, nearly identical to that sent in connection with the sale of shares in the Ralph Trust, was sent to all shareholders, including Kenneth, with a copy to his attorney, on June 16, 2008. [rec. doc. 51-2, Ex. A-18].  The *pro rata* number of shares that Kenneth could buy if he exercised his option was said to be 98 shares. [*Id*.].  Like the prior Option Notice, the Notice advised that "[i]n the event that some, but not all, of the shareholders elect to purchase their proportionate share of the Trust Shares, the Corporation must send a *second notice* to those shareholders who elected to purchase in the first option period, who will, for a period of ten days after the receipt of the notice, have a preferential right to purchase, on a *pro rata* basis, any of the trust shares that the shareholders did not elect to acquire in connection with issuance of the first notice." [*Id*. (emphasis added)].

7

Moreover, as was the case with the prior Option Notice, the Notice provided that "[i]f, after both of the notices have been sent, the shareholders have not elected to purchase all of the Trust Shares, the Corporation has, for a period of five (5) days, the right to purchase any remaining shares." [*Id*.].  Finally, as was the case with the prior Option Notice, the Option Notice provided that "If the Corporation and the shareholders elect not to purchase the Trust Shares in accordance with the Buy-Sell Agreement, the Trust may sell the Trust Shares to Ronald E. Brumley within the time periods specified in the Buy-Sell Agreement." [*Id*.].

Neither Kenneth nor any other shareholder elected to exercise their right to purchase any of the shares in the Helen Trust under the Buy-Sell Agreement. [rec. doc. 51-1, Ex. A, ¶ 26]. Accordingly, apparently in accordance with the terms of his May 19, 2008 Offer[4], Ronald purchased 3,314 preferred shares from the Helen Trust, thereby increasing his ownership interest to 7,928 shares.

Thereafter, Helen, as trustee of the Helen Trust, donated the remaining 1,150 shares in the Helen Trust to Ronald, in equal blocks, by two separate *inter vivos* donations on October 16, 2008 and January 8, 2009, respectively.  [rec. doc. 51-2, Ex. A-20].

## PROCEDURAL BACKGROUND

The instant lawsuit was filed on June 29, 2009.  In his Complaint, Kenneth sets forth various causes of action, summarized as follows:

---

[4]Again, the "Stock Power" presented to this court does not state the sum paid for the shares, but rather, merely states that the sale was "for value received." [*See* rec. doc. 51-2, Ex. A-14].

1.      Individual and Derivative claim for Failure to Allow Inspection of Leam books and records;

2.      Individual and Derivative claims for Mismanagement and Breach of Fiduciary Duties by (a) failing to hold regular board and shareholder meetings, (b) refusing to create a financial committee to review, evaluate and manage the financial affairs of Leam; (c) refusing to require officers and directors to disclose their personal financial dealings with Leam; (d) authorizing Leam to file suit against Kenneth in the Louisiana 19th Judicial District Court to remove Kenneth from the Board; (e) authorizing Leam to make improper and excessive payments to entities (Conroe Machine, LLC and Reme, LLC[5]) controlled or owned by Ronald in violation of Ronald's fiduciary duty of loyalty not to engage in self-dealing or usurp corporate opportunities; (f) preventing Kenneth from obtaining Leam information, using corporate funds to do so; and (g) permitting Ronald to exercise complete control over Leam by acquiring Leam stock.

3.      Individual claim for failure to pay dividends

4.      Abuse of Rights claim

5.      Request for Appointment of a Receiver

---

[5]Plaintiff also alleged a violation of Ronald's fiduciary duty of loyalty not to engage in self-dealing or usurp corporate opportunities with respect to Imperial Wireline, Inc.  However, during oral argument, plaintiffs counsel acknowledged that Imperial Wireline, Inc. is not owned by Ronald.  Accordingly, this issue is moot.

On August 31, 2009, the defendants filed a Motion for Summary Judgment. [rec. doc. 13].  On September 16, 2009, the Motion was denied as premature, and Kenneth was given the opportunity to conduct discovery. [rec. doc. 22].  By Order dated October 20, 2009, discovery was "limited to those issues presented in the defendants' Motion for Summary Judgment and those issues reasonably necessary to oppose that Motion." [rec. doc. 27; *see also* rec. doc. 41 (limiting discovery depositions of Ronald, Leam and Luann "to issues presented in the defendants' Motion for Summary Judgment and those issues reasonably necessary to oppose that Motion")].  Following over a one year period for discovery, the defendants re-filed their Motion for Summary Judgment on November 5, 2010. [rec. doc. 51].

**LAW AND ANALYSIS**

**Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]

Rule 56(e) provides, in pertinent part, as follows:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)[7], the court may: . . .

---

[6]Rule 56 was revised, effective December 1, 2010, "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." *See* Committee Notes, Rule 56.

[7]Rule 56(c)(1) provides, in pertinent part, as follows:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions,

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . .

The Motion for Summary Judgment is properly made and supported.  Thus, Kenneth may not rest upon the allegations in his pleadings, but, rather, must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986).

However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions and those supported by only a scintilla of evidence are insufficient. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Additionally, summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2552.

Kenneth has submitted evidence in opposition to the instant Motion.  However, Kenneth's evidence fails to demonstrate that there is a genuine issue of material fact. Accordingly, summary judgment in favor of the defendants is appropriate.

---

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

## LAW AND ANALYSIS

Plaintiff invokes this Court's diversity jurisdiction. [rec. doc. 1, ¶ 1].  Leam is a Louisiana corporation. Accordingly, the law of  Louisiana, applies.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and La. R.S. 12:1502A.  When a federal court, sitting in diversity, is presented with an unsettled point of state law, the role of the federal court under *Erie*, "is to determine how the Louisiana Supreme Court would resolve the issue if presented to it."  *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 949 F.2d 1384, 1386 (5th Cir. 1991) *quoting Coatings Mfrs., Inc. v. DPI, Inc.*, 926 F.2d 474, 479 (5th Cir 1991).

The  court, "[w]hen making an *Erie*-guess in the absence of explicit guidance from the state courts, must attempt to predict state law, not to create or modify it." *Id. citing United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir. 1986) and *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 396-98 (5th Cir. 1986) (*en banc*). "[Federal courts] are not free to fashion new theories of recovery under Louisiana law." *Id. citing Pittman v. Dow Jones & Co.*, 834 F.2d 1171, 1171 (5th Cir. 1987).

**1. Individual and Derivative claim for Failure to Allow Inspection of Leam books and records**

Plaintiff, Kenneth, concedes that this claim has been fully litigated and resolved against him in a prior lawsuit filed by him in the 16th Judicial District Court for Iberia Parish, Louisiana.  Accordingly, this claim is barred by *res judicata*.

12

**2.  Individual and Derivative claims for Mismanagement and Breach of Fiduciary Duties**

The following law applies to Kenneth's individual and derivative claims for corporate mismanagement and breach of fiduciary duties.

Under Louisiana law, "a shareholder does not generally have a right to sue personally for losses sustained by the corporation due to mismanagement or breach of fiduciary duty." *Hebert v. Blanchette*, 2 So.3d 1259, 1261 (La. App. 3rd Cir. 2009) *citing Boyer v. Stric-Lan Cos., Corp.*, 888 So.2d 1037 (La. App. 3rd Cir. 2004); *Glod v. Baker*, 851 So.2d 1255 (La. App. 3rd Cir. 2003), *writ denied*, 860 So.2d 1135 (La. 2003); *Palowsky v. Premier Bancorp, Inc.*, 597 So.2d 543 (La. App. 1st Cir. 1992).  "Rather, a shareholder may only sue to recover losses to a corporation resulting from mismanagement and breaches of fiduciary duties secondarily through a shareholder's derivative suit." *Palowsky*, 597 So.2d at 545.

The exception to this general rule is that where the breach of fiduciary duty causes loss to a shareholder personally (as opposed to causing a loss to all shareholders or the corporation itself), the shareholder may sue individually to recover his personal loss.  *Palowsky*, 597 So.2d at 545 *citing Wilson v. H.J. Wilson Co., Inc.*, 430 So.2d 1227, 1234 (La. App. 1st Cir.), *writ denied*, 437 So.2d 1166 (1983).[8]

---

[8]In *Wilson* the court explained the exception to the general rule as follows:

[W]here the breach of fiduciary duty causes loss to a corporation itself, the suit must be brought as a derivative or secondary action. However, that is not the case where the breach of a fiduciary duty causes loss to a shareholder personally. In case of personal loss, the shareholder may sue individually to recover his loss.

*Wilson*, 430 So.2d at 1234 (citations omitted).

13

Thus, Kenneth does not have an individual right of action with respect to acts or omissions of the defendants which allegedly caused a loss or harm to all shareholders or to Leam, but may only sue individually for loss or harm sustained only by him personally (individually), rather than as a shareholder.

The parties agree that the limitation periods set forth in La. R.S. 12:1502 for actions against any corporate officer, director or shareholder apply to the instant action.  Section 1502 provides the following limitation periods:

(1) claims for breach of fiduciary duty, including actions for negligence or gross negligence, "one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered, but in no event shall [such] an action . . . be brought more than three years from the date of the alleged act, omission, or neglect" [La. R.S. 12:1502(C)];

(2) claims for intentional tortious misconduct, an intentional breach of a duty of loyalty, acts or omissions in bad faith or involving fraud, or a knowing and intentional violation of law, "two years from the date of the alleged act or omission, or within two years from the date the alleged act or omission is discovered or should have been discovered, but in no event shall [such] an action . . . be brought more than three years from the date of the alleged act or omission." [La. R.S. 12:1502(D)].

The statute further provides that, "The time limitations provided in this Section shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of

14

competent jurisdiction and proper venue." [La. R.S. 12:1502(E) (emphasis added)].

The parties apparently agree that La. R.S. 12:1502 provides for both prescriptive and peremptive periods.[9]  Given the wording of the statute, that is a reasonable conclusion to draw. In fact, when the Court first read the provisions of § 1502, the Court drew the same conclusion.[10]  However, The Court's independent research has convinced the Court that § 1502 is a "hybrid" prescription provision, that is, a prescription statute that is subject to time limitations that have peremptive attributes.  *See Suhren v. Gibert*, 55 So.3d 941, 946-947 (La. App. 4th Cir. 2011); *Wooley v. Lucksinger,* 14 So.3d 311, 458-462 (La. App. 1st Cir. 2008), *rev'd on other grounds*, 61 So.3d 507 (La. 2011).[11]

_____

[9] Liberative prescription prevents the enforcement of a right of action, but does not terminate the natural obligation.  Louisiana law provides that prescription can be renounced, interrupted, and suspended. La. C.C. arts. 3449–3451, 3462–3472.  Peremption is a period of time, fixed by law for the existence of the right, and unless exercised, the right is extinguished upon the expiration of the peremptive period.  Consequently, peremption may not be renounced, interrupted or suspended.  La. C.C. art. 3461.  *Borel v. Young*, 989 So.2d 42, 48-9 (La. 2007).

[10]Generally, when a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay stipulated is one of peremption. *Guillory v. Avoyelles Ry. Co.,* 104 La. 11, 15, 28 So. 899, 901 (La. 1900).

"Although the Civil Code now recognizes in Articles 3458-61 the previously existing jurisprudentially-created doctrine of peremption, the Code gives no guidance on how to determine whether a particular time limitation is prescriptive or peremptive. Additionally, more often than not, the language used in a particular statutory time limitation does not easily admit on its face of a conclusion as to its prescriptive or peremptive nature. Consequently, this court has resorted to an exploration of the legislative intent and public policy underlying a particular time limitation, for it is primarily whether the legislature intended a particular time period to be prescriptive or peremptive that is the deciding factor in such a case." *State Through Div. of Admin. v. McInnis Bros. Const.*, 701 So.2d 937, 940 (La. 1997).

[11]In *Wooley*, the Court, relying on the title of the Act which enacted § 1502, and which appeared after the enacting clause of the Act, held that § 1502 created a hybrid liberative prescriptive statute. *Id.* at 461-62.  The Court in *Suhren* agreed. *Id.* at 946-47.  This Court also agrees, for the reasons set out in those cases and the reasoning in *McInnis Bros. Const., supra.*

The defendants argue that the claims made by Kenneth are perempted.  Kenneth asserts that his claims are not perempted, based on the continuing tort doctrine.  If § 1502 provided for peremption, Kenneth's argument would fail because the continuous tort doctrine does not apply to peremption  La. C.C. art. 3461.  *See also Brumfield v. McElwee*, 976 So.2d 234, 241 (La. App. 4th Cir. 2008) (continuous tort doctrine does not suspend peremption) and *Zoulek v. PIP America*, 2 S.3d 511, 514 (La. App. 4th Cir. 2008) (one of the key differences between peremption and prescription is that peremption may not be renounced, interrupted or suspended even by the doctrine of *contra non valentum*).[12] [13]

Kenneth's argument fares no better under the "hybrid" prescriptive scheme created by § 1502.  Application of the continuing tort doctrine in this case is precluded by the specific wording of La. R.S. 12:1502(E), which expressly provides that actions brought under La. R.S. 12:1502 are not subject to suspension or interruption, unless a suit is timely filed.  This was recognized by the Louisiana Fourth Circuit Court of Appeal in *Suhren,* which held that  "[t]he

_____

[12] The continuous tort doctrine is a jurisprudentially recognized the doctrine that provides that continuous tortious conduct and continuous damages may suspend *prescription*.  *Brumfield, supra., citing Scott v. American Tobacco*, 949 So.2d 1266, 1279–80 (La. App. 4th Cir. 2007) (emphasis added); *Bustamento v. Tucker*, 607 So.2d 532, 537 (La. 1992); *South Central Bell Telephone Co. v. Texaco, Inc*., 418 So.2d 531, 533 (La. 1982) ("[w]hen . . . tortious conduct and resulting damages continue, *prescription* does not begin until the conduct causing the damages is abated.") (emphasis added).

[13] The undersigned acknowledges that there are cases from the Louisiana First Circuit Court of Appeal, interpreting The Louisiana Unfair Trade Practices Act, which suggest that the continuing tort doctrine applies to suspend a *peremptive* period in cases where there is a continuing statutory violation. *See Benton, Benton & Benton v. Louisiana Public Facilities Authority*, 672 So.2d 720 (La. App. 1st Cir. 1996).  However, as noted by the Louisiana Third Circuit Court of Appeal, these cases improperly rely on Louisiana Supreme Court precedent interpreting a *prescriptive* statute "to build from the suspension of prescription until a continuing tort has abated into the suspension of peremption." *See Glod v. Baker*, 899 So.2d 642, 648-649 (La. App. 3rd Cir. 2005).  This Court declines to extend the suspect reasoning in *Benton* (under the Louisiana Unfair Trade Practices Act) to this case under § 1502.

16

continuing tort doctrine is not applicable to statutory claims that bar suspension of the prescriptive period [of La. R.S. 12:1502] as that would only serve to subvert the ban in the first place." *Id.* at 947.  Thus, the Fourth Circuit concluded that under § 1502, the plaintiffs could "not levy claims under the continuos tort doctrine" after the expiration of the three-year period. *Id*.

More recently, Judge Brady of the United States District Court for the Middle District of Louisiana adopted the reasoning of the Fourth Circuit in *Suhren* in ruling against the plaintiff who invoked the continuing tort doctrine in opposition to a joint venturer's assertion that claims based on breach of fiduciary duty, gross negligence, intentional tortious misconduct, intentional breach of the duty of loyalty, intentional unlawful distribution, and acts or omissions in bad faith or involving fraud or a knowing and intentional violation of law should not be dismissed as time-barred. *Camsoft Data Systems, Inc. v. Southern Electronics*, 2011 WL 3204701, *3-4 (M.D. La. 2011). Like Judge Brady, this Court is persuaded by the *Suhren* decision, and, accordingly, adopts the reasoning set forth therein.

Accordingly, the Court construes § 1502 as follows.  Section 1502 is a "hybrid" prescription statute, that is, a prescription statute that is subject to time limitations that have peremptive attributes.  The prescriptive period for claims of breach of fiduciary duty, for actions based on negligence or gross negligence is one year from the date the alleged act is discovered or should have been discovered.  The prescriptive period for intentional tortious misconduct, acts or omissions in bad faith, for fraud or for a knowing and intentional violation

of the law is two years from the date the alleged act is discovered or should have been

discovered.  In no event, however, may any claim be brought more than three years from the

date of the alleged act or omission.  These time periods may not be interrupted or suspended on

any ground (including for a continuous tort) except by timely suit filed in a court of competent

jurisdiction.[14]

Accordingly, Kenneth's argument that the continuing tort doctrine suspends the running

of  the applicable prescriptive (or peremptive) period is rejected.

Section 1502 incorporates the discovery interruption rule by providing that the

prescriptive period only begins to run from the date when the plaintiff discovered or should

have discovered the act complained of, but places a three year cap on the rule, making the

discovery interruption rule inapplicable after three years from the date of the act.  *See Id.  See

also Campo v. Correa,* 828 So.2d 502, 508-509 (La. 2002) (interpreting similar language found

in La.R.S. 9:5628).[15]

The "date of discovery," from which prescription begins to run, is "the date on which a

reasonable man in the position of the plaintiff has, or should have, either actual or constructive

knowledge of the damage, the delict, and the relationship between them sufficient to indicate to

a reasonable person he is the victim of a tort and to state a cause of action against the

defendant."  *Id.* at 1275 (citation omitted). Put more simply, the date of discovery is the date

---

[14]This, of course, is the peremptive attribute of § 1502.

[15]This rule applies even if the plaintiff's ignorance is not induced by the defendant. *Teague*, 974
So.2d at 1274 (citation omitted).

the act or omission was discovered, or should have been discovered, by a reasonable person in

the plaintiff's position. *Id.*

The Louisiana Supreme Court explained the reasonableness of the date of discovery as

follows:

> Prescription commences when a plaintiff obtains actual or constructive
> knowledge of facts indicating to a reasonable person that he or she is the victim
> of a tort. A prescriptive period will begin to run even if the injured party does not
> have actual knowledge of facts that would entitle him to bring a suit as long as
> there is constructive knowledge of same. Constructive knowledge is whatever
> notice is enough to excite attention and put the injured party on guard and call for
> inquiry. Such notice is tantamount to knowledge or notice of everything to which
> a reasonable inquiry may lead. Such information or knowledge as ought to
> reasonably put the alleged victim on inquiry is sufficient to start running of
> prescription.

*Teague*, 974 So.2d at 1275-1276 *quoting Campo v. Correa*, 828 So.2d 502, 510-11 (La. 2002)

(internal citations omitted).

Accordingly, in this case, prescription pursuant to La. R.S. 1502 commenced to run

when Kenneth knew or should have known of the existence of facts sufficient to have excited

his attention and call for inquiry.

The prescriptive period for any claims involving negligent or intentional tortious

misconduct, which is asserted against any defendant in his or her capacity as a corporate

officer, director or shareholder, is one year from the date of injury or the damage is sustained.

La. C.C. art. 3492.

### (a) failing to hold regular board and shareholder meetings

Kenneth alleges that Ronald and Luann engaged in corporate mismanagement by "refusing to hold or otherwise interfering with the regular holding' of board and shareholder meetings. *See* rec. doc. 1, ¶ 13(a).  The allegation has no temporal limitation.  To the extent that Kenneth seeks to impose derivative liability for alleged acts or omissions which occurred over three years prior to the filing of this lawsuit, that is, prior to June 29, 2006, that claim is prescribed.  During this period, Kenneth was either a shareholder, a director, or both.  Accordingly, he clearly should have discovered the facts supporting any such claim on or before June 29, 2006.

Furthermore, the claim fails on the merits.  The defendants have presented uncontradicted evidence establishing that shareholder meetings were held in 2006, 2007 and 2008, that Kenneth received notice of these meetings and that he attended some of them in person or by proxy. [rec. docs. 51-1, Ex. A-9; 51-2, Exs. A-23, A-24, A-25 and A-26].  Under Louisiana law, that is all that is required.  *See* La. R.S. 12:73(A) (requiring "at least one meeting of the shareholders . . . in each calender year . . . .").

Moreover, the defendants have presented uncontradicted evidence establishing that Kenneth was not re-elected to the Board on September 4, 2007.  Accordingly, he had no right to call, request or attend Board meetings held after that date.  The defendants have further established that from June 29, 2006 through September 4, 2007, Leam held Board meetings in accordance with § 5.3 of Leam's Bylaws on August 1, 2006, August 9, 2006 and October 17,

2006, and that during this period, there was no request for any special meeting of the Board pursuant to § 5.4 of the Bylaws. *See* La. R.S. 12:81(C) (requiring that board meetings be held as "prescribed by the articles or by the bylaws" of the corporation). [rec. doc. 51-2, Ex. A-27].

While acknowledging that the shareholder and board meetings were in fact held, Kenneth now conclusorily asserts that the meetings were inadequate because they were "not formal or recorded and amount to little more than telephone calls" of an alleged "cursory nature." [*See* rec. doc. 55, pg. 18-19, ¶ D-2 and pg. 22, ¶ G].  However, Kenneth does not contest the adequacy of the meetings in his Complaint – his allegation is that the meetings were not held.  The defendants have shown this allegation to be without factual merit.  Furthermore, no special form of the meetings is required by law.

To the extent that this claim is asserted by Kenneth individually against Ronald or Luann, Kenneth has no right of action.  The alleged failure to hold shareholder and board meetings resulted in no personal or individual loss which could support an individual action.

Accordingly, summary judgment is properly granted on this claim.

**(b) refusing to create a financial committee to review, evaluate and manage the financial affairs of Leam**

Kenneth alleges that Ronald and Luann engaged in corporate mismanagement by "refusing to create and/or permit the creation of a financial committee of the Board to review, evaluate and manage the financial affairs of Leam." [rec. doc. 1, ¶ 13(c)].  The defendants have presented uncontradicted evidence establishing that Kenneth knew or should have known the existence of facts that would have enabled him to state this cause of action against Ronald

21

and/or Luann, at the latest, by October 17, 2006.

The minutes of  board meetings held on August 1, 2006 and October 17, 2006, which were approved by Kenneth, reveal that motions to form a finance committee were made, but failed to pass for lack of a majority vote. [rec. docs. 51-1, Ex. A- 8; 51-2, Ex. A-21].  The first such Motion, made during the August 1, 2006 board meeting, proposed the formation of a finance committee consisting of Ralph, Helen and Ronald, empowered to exercise the delegated power of the board to "decide whether and when and in what form . . . to release the financial statements of the corporation and subsidiaries to the remaining members of the board and shareholders of the corporation, with the understanding . . . that all unreleased information relating to or derived from the financial statements shall be held in confidence."  Upon failure of the Motion, Ralph, Kenneth and Frank agreed to write a new resolution to be presented to the board. [rec. doc. 51-1, Ex. A-8].

Three such resolutions were presented to the board for consideration during a special meeting on October 17, 2006.  The first resolution proposed the formation of a finance committee consisting of Ralph, Helen and Ronald, empowered to review "the monthly financials of Leam . . . and any subsidiary companies . . . and advise the Board of Directors on disclosure of financial information to shareholders. . . . " The second resolution required the President to furnish the financial committee with a financial summary, including sales, profits and expenditures, after the end of each accounting period.  The third resolution required all board members and corporate officers "to disclose, in writing, to the board of directors, any

22

interest which that person has or acquires in any company or business doing business with

Leam investments or any of its subsidiaries" at the time of acquisition, and that such

disclosures be updated on an annual basis.  Kenneth, who was present at the meeting and

exercised Frank's proxy, moved to adopt each resolution.  Kenneth, Frank and Ralph voted for

adoption, while Helen, Luann and Ronald voted against adoption.  The resolutions therefore

failed to pass. [rec. doc. 51-2, Ex. A-21].

In light of these minutes, it is clear that Kenneth knew that the defendants would not

"create and/or permit the creation" of a financial committee, at the latest, by October 17, 2006

when both Ronald and Luann failed to vote in favor of Kenneth's proposed resolutions.  A

reasonable person in Kenneth's position had, or should have had, sufficient knowledge of the

alleged tort to state a cause of action as of that date. This knowledge is sufficient to start the

running of prescription. Suit was not filed until well over two years later on June 29, 2009.

Accordingly, this claim is prescribed.

To the extent that this claim is asserted by Kenneth individually against Ronald or

Luann, Kenneth has no right of action.  The alleged failure to create a financial committee

resulted in no personal or individual loss to Kenneth which could support an individual action.

For these reasons, summary judgment is properly granted with respect to this claim.

**(c) refusing to require officers and directors to disclose their personal
financial dealings with Leam**

Kenneth alleges that Ronald and Luann engaged in corporate mismanagement by

"refusing to require that officers and directors of Leam disclose their personal financial

23

dealings with Leam . . . ." [rec. doc. 1, ¶ 13(d)].  For the same reasons set forth above, this claim is prescribed.

Uncontroverted evidence demonstrates that the action complained of by Kenneth, the refusal to require Leam officers and directors to disclose personal financial dealings with Leam, occurred, at the latest, on October 17, 2006.  Kenneth's attendance at that meeting and approval of the minutes of that meeting establishes that, on that date, Kenneth knew the existence of the facts which should at least have put Kenneth on inquiry.  Kenneth failed to file suit within two years of that date.  Accordingly, this claim is also prescribed.  Moreover, while Kenneth argues that the failure to disclose constitutes continuing violation of the duty set forth in La. R.S. 12:84, as set forth above, Kenneth cannot rely on the continuous tort doctrine.  *See Camsoft Data Systems, Inc.* and *Suhren, supra.*  Accordingly, this claim is prescribed.

To the extent that this claim is asserted by Kenneth individually against Ronald or Luann, Kenneth has no right of action.  The alleged failure to disclose personal financial dealings with Leam resulted in no personal or individual loss to Kenneth which could support an individual action.

For these reasons, summary judgment is properly granted with respect to this claim.

**(d) authorizing Leam to file suit against Kenneth in the Louisiana 19ᵗʰ Judicial District Court to remove Kenneth from the Board**

Kenneth alleges that Ronald and Luann engaged in corporate mismanagement by "authorizing and/or unilaterally directing Leam to file suit against [Kenneth] in the Louisiana 19ᵗʰ Judicial District Court seeking to remove him from the Board . . . ." [rec. doc. 1, ¶ 13(e)].

24

The uncontroverted evidence establishes that in 2006, Frank began working for Strata Directional Drilling, Inc. ("Strata"), a direct competitor of Leam's primary subsidiary, Leam Drilling, a directional drilling company.  Kenneth joined Frank as a Strata employee in early 2007. [rec. doc. 51-3, Ex. B, ¶ 7 and 8; rec. doc. 51-5, ¶ 57[16]].

Thereafter, on April 12, 2007, Leam filed suit against Frank and Kenneth in the Nineteenth Judicial District Court, seeking an injunction requiring Frank and Kenneth to resign from their positions as directors of Leam based on their employment with Strata, an alleged direct competitor of Leam, which allegedly created an irreconcilable conflict of interest with their duty of loyalty owed to Leam. [rec. doc. 51-3, Ex. B-1].   Kenneth was served with this lawsuit on May 4, 2007. [rec. doc. 51-3, Ex. B-5].  Thus, it is clear that Kenneth knew, no later than May 4, 2007, that Leam had filed suit against him, seeking to remove him from the board. Accordingly, an action based on the institution of this lawsuit prescribed, at the latest, two years later on May 4, 2009.  The instant lawsuit, however, was not filed until June 29, 2009.

Kenneth argues that he "had no way to know at the time of filing of the lawsuit that it's filing was not for legitimate purposes" but, rather, "that the lawsuit was a pretext" to remove him from the board.  [rec. doc. 55, pg. 20].  However, from a cursory reading of the allegations of the lawsuit, a reasonable man in Kenneth's position would, or should, have known that the purpose of the lawsuit was to remove him as a director of the company as a result of an alleged conflict of interest.  No further inquiry would have been necessary for Kenneth, or a reasonable

---

[16]By affidavit, Kenneth does not dispute that Strata is a direct competitor of Leam Drilling Systems, Inc. Rather, he contests only whether he would have shared Leam information with Strata. [*See* rec. doc. 55-1, Ex. 1].

man in Kenneth's position, to form the conclusion, whether correct or incorrect, that the lawsuit was a mere pretext to accomplish this purpose.

That is particularly true under the circumstances which existed at the time the lawsuit was filed.  The evidence presented to this court shows that there had been a longstanding family division over the control of Leam which predated the filing of the lawsuit – Ralph, Frank and Kenneth on one side, and Helen, Ronald and Luann on the other.   Thus, upon receipt of the lawsuit, any reasonable person in the same circumstances as Kenneth would have immediately been put on notice of the facts which would support this claim. Accordingly, Kenneth's argument fails to present any material issue of fact precluding summary judgment.

Furthermore, to the extent that this claim may be characterized as asserting negligent or intentional tortious misconduct by any defendant in their individual rather than corporate capacity, that claim is likewise prescribed under the one year prescriptive period set forth in Louisiana Civil Code article 3492.

Thus, regardless of whether this claim has been asserted individually or derivatively, or constitutes a claim for a "non-business" tort, the claim is prescribed.  Summary Judgment is therefore properly granted.

**(e) authorizing Leam to make improper and excessive payments to entities (Conroe Machine, LLC and Reme, LLC) controlled or owned by Ronald in violation of Ronald's fiduciary duty of loyalty not to engage in self-dealing or usurp corporate opportunities**

Kenneth alleges that Ronald and Luann engaged in corporate mismanagement by "authorizing and/or permitting Leam to make improper and grossly excessive payments to

26

entities controlled and/or owned by Defendant Ronald Brumley", namely Conroe Machine, LLC ("Conroe Machine") and Reme, LLC.  ("Reme"), a business affiliated with Conroe Machine.  [rec. doc. 1, ¶ 13(f), 25-40].  The alleged acts of mismanagement, including self-dealing and usurpation of corporate opportunities by Ronald, as well as the entities to which Kenneth refers, are more fully described in paragraphs 25-40 of the Complaint.

In paragraphs 37 and 38 of his Complaint, Kenneth alleges that he "made various requests and proposed resolutions requiring that members of the Leam Board disclose, in writing, any interest which that person has or acquires in any company or business doing business with Leam or any of its subsidiaries" but that "[n]ot surprisingly, Defendant Ronald Brumley refused to vote in favor of requiring any such disclosures of financial dealings between a member of the Board and Leam." [rec. doc. 1, ¶ 37 and 38].

It is undisputed that in 2000, Ronald formed Conroe Machine and Reme, both of which are Texas, limited liability companies, located in Conroe, Texas. [rec. doc. 51-3, Exs. B-6 and B-7].  In support of their Motion for Summary Judgement, the defendants have submitted copies of board minutes from a special meeting held on August 3, 2002, at which meeting Kenneth was present.  The minutes reflect that there was a  discussion of Ronald's ownership of other business entities in Conroe, Texas at the meeting as the minutes reflect that "a motion was made that Ronald E. Brumley should divest any interest he has in the machine shop located in Conroe, Texas." However, the motion died for lack of a second.  Kenneth signed these minutes.  [rec. doc. 51-2, Ex. A-22].

The subject of Ronald's ownership of businesses doing business with Leam was again the subject of discussion at the board meeting held on August 1, 2006.  The minutes of that meeting indicate that in addition to the board having considered the formation of a finance committee, a motion was made by Ralph "to appoint 2 people to seek legal advice for ramifications of President owning a business that feeds off of the business we run."  Although the motion was seconded by Frank, the motion was thereafter withdrawn by Ralph. [rec. doc. 51-1, Ex. A-8].

As previously noted, at the August 1, 2006 meeting, Ralph, Kenneth and Frank agreed to write a new resolution, which resulted in the presentation of four proposed resolutions to the board during a special meeting held on October 17, 2006.  One of those four proposed resolutions, again, specifically addressed Ronald's outside business interests, requiring all board members and corporate officers "to disclose, in writing, to the board of directors, any interest which that person has or acquires in any company or business doing business with Leam investments or any of its subsidiaries at the time of acquisition, and that such disclosures be updated on an annual basis."  Kenneth, moved to adopt this resolution and, along with Frank and Ralph, voted for adoption; Helen, Luann and Ronald voted against adoption.  The resolution therefore failed to pass. [rec. doc. 51-2, Ex. A-21].

These documents establish that Kenneth knew that Ronald owned or had an interest in a machine shop business in Conroe, Texas which was doing business with Leam as early as August 6, 2002, as divestiture of Ronald's interest in that business was the subject of a motion

28

at the board meeting on that date.

Moreover, it is clear that Kenneth was again apprised of Ronald's ownership and interest in businesses which were doing business with Leam in August, 2006 when Ralph moved to obtain legal advice on the ramifications of Ronald, the President of Leam, owning a business that was doing business with Leam.  Finally, and most tellingly, as plead in paragraphs 37 and 38 of his Complaint, Kenneth himself presented this issue to the board at the October 17, 2006 meeting when he sought adoption of a "proposed resolution[]" which would have required Ronald "to disclose, in writing," his interests in all companies doing business with Leam, which resolution, Ronald "refused to vote in favor of."

While Kenneth argues that this knowledge is insufficient to "trigger prescription" on these claims, the jurisprudence holds otherwise.  "Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort."  *Teague*, 974 So.2d at 1275-1276.  "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry.  Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead.  Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start the running of prescription."  *Id*.

Kenneth obtained the requisite knowledge or notice to start the running of the prescriptive period in August 2002, or, at the latest, on October 17, 2006.  By October 17, 2006, Kenneth knew that Ronald controlled or had ownership interests in companies which were doing business with Leam, and this knowledge constitutes sufficient notice to "excite

[his] attention."  Yet, Kenneth failed to file suit asserting his claims of Ronald's alleged self-dealing and usurpation of corporate opportunities through his ownership or interest in the Conroe, Texas businesses until June 29, 2009.

Moreover, while Kenneth again argues that the claim is timely based on Ronald's "continuing fiduciary duty" or "continuing obligation to review third-party contracts", that argument fails for the reasons set out in *Suhren,* and by Judge Brady in *Camsoft Data Systems, Inc.*[17]  For these reasons, this claim is prescribed.

To the extent that this claim is asserted by Kenneth against Ronald or Luann, individually, Kenneth has no right of action.  The alleged self-dealing and usurpation of corporate opportunities resulted in no personal or individual loss which could support an individual action.

For these reasons, summary judgment is properly granted with respect to this claim.

**(f) preventing Kenneth from obtaining Leam information, using corporate funds to do so**

It is unclear whether Kenneth concedes that this claim is barred by *res judicata*, having been fully litigated and resolved against him in the prior lawsuit filed by him in the 16th Judicial District Court for Iberia Parish, Louisiana.  However, to the extent that the claim is not barred by *res judicata*, it is nevertheless prescribed.

---

[17]The court also notes that Ronald testified in his deposition that comparisons between the cost to Leam of using Conroe Machine as opposed to contracting with a third-party have been done, however, he did not know when the last such comparison was done.  Moreover, Ronald testified that the Conroe Machine sets prices for Leam in accordance with a directive from the person who runs the company, Murray Touchette, that Leam's prices are at or below the prices charges to other customers.  *See* Deposition of Ronald E. Brumley, pg. 72-73.

Paragraph 6 of the Complaint alleges that in September 2003, Ronald "completely shut off [Kenneth's] access to information about Leam's business activities and financial condition", despite Kenneth's "numerous requests" for such access. [rec. doc. 1, ¶ 6]. Further, the August 1, 2006 board meeting minutes reflect that after the motion to form a finance committee, with incorporated provisions regarding the release of financial statements to shareholders and board members, like Kenneth (who were not to be on the committee), failed, Kenneth "requested financial statements starting with March 06" as well as "financial statements and the plan of budget for the year 06/07." [rec. doc. 51-1, Ex. A-8].

While the minutes do not reflect the disposition of Kenneth's request, it is clear from his affidavit (which was submitted in opposition to the instant Motion) that his request was denied, since Kenneth avers that "I have not received from the company financial information, accounting, annual report or dividends since at least 2004" that "Leam has had no communication with me since approximately 2004" and that "[n]o information concerning the operation of Leam or its financial condition has been given in any shareholder's meeting . . . since at least 2006." [rec. doc. 55-1]. Further, in opposition to the instant Motion, Kenneth asserts that the "defendants have denied him any information about the operation of Leam since at least 2006." [rec. doc. 55, pg. 12].

Based on the foregoing, there is no material dispute that any claims relating to the defendants' alleged refusal to provide Kenneth with Leam information arose more than two years prior to the date the instant action was filed. Clearly, by 2006 at the latest, Kenneth knew

31

that the defendants were not providing him with Leam information, sufficient for him to know that he was the victim of this alleged tort. No suit was filed until 2009. While Kenneth now suggests that this tort was committed through the alleged use of Leam funds does not change the nature of the alleged wrong. Finally, although Kenneth suggests that his claim is timely based an alleged "continuing course of conduct", that argument fails based on *Suhren,* and *Camsoft Data Systems, Inc.*

During oral argument plaintiff's counsel argued that, with respect to access to corporate information, Kenneth had been treated differently than co-director, Luann, and, therefore, this claim could be pursued in an individual action. To the extent that this claim is asserted by Kenneth individually against the defendants, the claim is likewise prescribed, albeit under the applicable one year prescriptive period set forth in Louisiana Civil Code article 3492.

Given the longstanding division in the family over the control of Leam, Kenneth clearly had knowledge, or at a minimum, should have had knowledge, that he may have been being treated differently than Luann, well over one year prior to the date that this action was filed. Indeed, prior to June 29, 2008, Kenneth had not only been denied corporate information, but had also been the subject of the 2007 lawsuit in which Luann had not been named as a defendant. While Kenneth may not have had actual knowledge of all of the facts that would entitle him to bring a claim based on alleged unequal treatment, he nevertheless had sufficient notice of the facts to excite his attention, thus constituting constructive knowledge.

For these reasons, summary judgment is properly granted with respect to this claim.

**(g) permitting Ronald to exercise complete control over Leam by acquiring Leam stock**

The defendants argue that Kenneth's corporate mismanagement and breach of fiduciary duty claims regarding the acquisition of Leam stock by Ronald have prescribed because this action was filed over one year from February 5, 2008 and June 16, 2008, the dates Kenneth received notice that the board had decided not exercise its option to purchase the preferred shares of stock in the Ralph Trust and the Helen Trust, respectively.  As set forth above, the one year prescriptive period is applicable to negligent tortious misconduct. *See* La. R.S. 12:1502(C).   However, in this case, Kenneth contends that the defendants engaged intentional tortious misconduct and that their actions were taken in bad faith, thus implicating the two year prescriptive period.  *See* La. R.S. 12:1502(D).

In light of  the documentation presented to this court, particularly the emails Ronald sent to his mother (Helen), and his sister (Luann), outlining his reasons for wanting to purchase the preferred stock from the Ralph Trust, the court finds that there is a material issue of fact as to whether the complained of actions were knowingly and intentionally taken. [*See* rec. doc. 55-2, Ex. 2].  Further, given that prescription is not favored, when, as is the case on this issue, the court is faced with "two possible constructions, that which favors maintaining, as opposed to barring, an action, should be adopted."  *Lima v. Schmidt*, 595 So.2d 624, 629 (La. 1992).  For these reasons, summary judgment on the basis of prescription is denied.

The defendants further argue that summary judgment on these claims is appropriate as a matter of law because Kenneth was afforded the same opportunity to purchase the preferred

stock "on an equal footing with Ron and all other shareholders of Leam, such that, if Kenneth had exercised his option and participated in both the stock sales, he and Ron could have purchased the same number of shares of Leam stock. . . ." [rec. doc. 51-4, pg. 18].

Kenneth argues that under the terms of the Buy-Sell Agreement, Kenneth only had the opportunity to buy his common stock proportional interest of the preferred shares, while under the terms of his proposed offer, Ronald was afforded the opportunity to buy substantially all of the preferred shares.  Thus, Kenneth argues that he was not granted an equal opportunity to purchase the preferred stock and, accordingly, the defendants have failed to demonstrate that they are entitled to summary judgement as a matter of law.[18]

It is undisputed that under Louisiana law, when an officer or director of a corporation purchases stock of the corporation, if the complaining shareholder had the same opportunity as the officer or director to purchase the stock, but opted not to do so, he has no claim for corporate mismanagement or breach of fiduciary duty. " *LaFleur v. Guilbeau*, 617 So.2d 1362, 1367-1368 (La. App. 3rd Cir. 1993); *Foster v. Blackwell*, 747 So.2d 1203, 1220-1221 (La. App. 3rd Cir. 1999); *Trayanoff v. Oak Island Land Co., Inc*., 870 So.2d 349, 359 (La. App. 4th Cir. 2004). This is so because under those circumstances the actions of the acquiring officer or director are deemed fair as they constitute no more than "the seizing of an opportunity that was offered to all shareholders." *LaFleur*, 617 So.2d at 1368.

Resolution of these claims depends on the proper interpretation of the Buy-Sell Agreement.  For the reasons which follow, Kenneth's argument is based on an incorrect

---

[18]But see fn1, infra.

interpretation of the Buy-Sell Agreement. Accordingly, because all shareholders were afforded the same opportunity to purchase the preferred stock in both the Ralph Trust and the Helen Trust, "on an equal footing", summary judgment is properly granted on these claims.

While Kenneth is correct that during the first fifteen day option period set forth in paragraph 4(b) of the Buy-Sell Agreement he could only purchase 132 shares, which corresponds to his proportional interest in the preferred shares offered for sale, he has failed to properly account for the shares which he could have purchased in the *second* ten day option period set forth in paragraph 4(c) of the Buy-Sell Agreement, had he fully exercised his rights to purchase in the *first* fifteen day option period.

It is undisputed that each shareholder was given notice of his or her rights to purchase their specifically designated *pro-rata* share of the preferred stock in the Ralph Trust during the first fifteen day option period, in this case, 132 shares for each of the Brumley children, Ronald, Frank, Kenneth and Luann, and 3,936 shares for the Helen Trust.[19]

Because it was entirely possible that not every shareholder would choose to exercise his or her option rights in full, the Buy-Sell Agreement provides for a second ten day option period set forth in paragraph 4(c) of the Buy-Sell Agreement, applicable only to "the shareholders who have exercised in full" their rights provided in the first option period.  The shareholders who fully exercised their rights during the first option period then had the option to purchase

---

[19]This number of shares is calculated by dividing the total number of shares owned by each shareholder who had a right to purchase the preferred shares being offered for sale, 5064 shares, by the number of shares owned by each shareholder, 150 shares for each child and 4,464 shares for the Helen Trust, then dividing the number of preferred shares offered for sale, 4,464 shares, by each shareholder's proportional interest as determined by the first calculation.

all of the remaining preferred shares that had not been acquired by Leam or any of the other shareholders in the preceding period.  The number of shares which these fully exercising shareholders could purchase is determined by the proportion of the number of shares each fully exercising shareholder owned and the aggregate number of shares owned by all fully exercising shareholders prior to the first option period.

Thus, if both Kenneth and Ronald would have fully exercised their option rights during the first fifteen day option period to acquire 132 shares each of the total 4,464 shares offered for sale, they would each have been eligible to purchase an additional 2100 shares of the remaining 4200 shares during the second ten day option period.  Their proportionate shares would have been determined by dividing the total number of shares owned by both prior to the first option period, 300 shares, by the number of shares owned by each prior to the first option period, 150 shares, then dividing the number of preferred shares still available for sale, 4,200 shares, by the proportional interest for each of them as determined in the first calculation (2.0).

Thus, both Ronald and Kenneth would have been able to purchase exactly the same number of shares, and Kenneth would have retained parity with Ronald.  The same would have been true if any number of the sibling shareholders had fully exercised his or her option rights during the first fifteen day option period.  In that case, each fully exercising sibling shareholder would have been eligible to purchase an equal number of the remaining shares.

This entire process was specifically disclosed and fully described to each shareholder in the Option Notice which was sent to every shareholder, including Kenneth and his attorney,

36

along with a copy of the Buy-Sell Agreement.  Although each shareholder, including Kenneth, was offered the same opportunity to purchase under the Buy-Sell Agreement, it is undisputed that none of the shareholders, including Kenneth, exercised his or her rights during the first fifteen day option period.  Thus, the second ten day option period was not triggered and the sale of all of the preferred stock in the Ralph Trust to Ronald was authorized under paragraph seven of the Buy-Sell Agreement.

The same analysis applies in connection with the sale of 3, 314 shares of the preferred shares of stock in the Helen Trust, with the same result.[20]

In light of the above, it is undisputed that the defendants complied with the terms and conditions of the Buy-Sell Agreement in connection with the sale of the preferred stock to Ronald. It is further undisputed that each shareholder, including Kenneth, was offered the same opportunity to purchase the preferred shares of stock under the Buy-Sell Agreement.  Kenneth chose not to avail himself of the opportunity.  Therefore, under Louisiana law,  Kenneth has no claim for corporate mismanagement or breach of fiduciary duty as the actions of the defendants, and, more specifically those of Ronald, are deemed fair as they constitute no more than "the seizing of an opportunity that was offered to all shareholders."  *LaFleur*, 617 So.2d at 1368.

---

[20]Kenneth does not appear to challenge his mother's donations to Ronald of the remaining preferred shares. Helen has not been named as a defendant in this lawsuit.  Moreover, even if those transactions were at issue, these *inter vivos* donations required no action by the board and were not subject to the restrictions set forth in the Buy-Sell Agreement. [*See* rec. doc. 51-1, Ex. A-5, ¶ 1].

This is particularly true, given that Kenneth's interest in Leam was not diluted as a result of the stock transfers.  Kenneth's percentage of ownership in Leam remained the same even though he failed to take the actions necessary to increase his stake, because no new shares were issued.  Summary Judgment on these claims is therefore properly granted as a matter of law.

### 3.  Individual claim for failure to pay dividends

In paragraph 50, Kenneth asserts an individual claim against the defendants for failure to pay dividends.  However, under Louisiana law, actions for nonpayment of dividends must be asserted derivatively because the non-payment "would have affected all shareholders eligible for dividends, not merely the plaintiff." *See Hebert*, 2 So.3d at 1262.  Accordingly, Kenneth has no individual right or cause of action.  Summary judgment on this claim is therefore properly granted.

### 4.  Abuse of Rights claim

Kenneth asserts that the actions of the defendants, and particularly the actions of Ronald, constitute an actionable abuse of rights.  The defendants respond that the Kenneth has failed to present sufficient evidence to support his claim, instead relying on conclusory allegations, speculation and unsubstantiated assertions in his Complaint.  The undersigned agrees.

The abuse of rights doctrine is a civilian concept which applies only when one of the following four conditions are met: (1) the predominant motive for exercise of the right is to

38

cause harm; (2) there is no serious or legitimate motive for exercise of the right; (3) the exercise of the right violates moral rules, good faith, or elementary fairness; or (4) the exercise of the right is for a purpose other than that for which it was granted. *Massachusetts Mut. Life Ins. Co. v. Nails*, 549 So.2d 826, 828-829 (La. 1989); *Truschinger v. Pak,* 513 So.2d 1151, 1154 (La. 1987); *Lee v Pennington*, 830 So.2d 1037, 1043 (La. App. 4th Cir. 2002).

Stated differently, for the abuse of right doctrine to apply, "the holder of an individual right must exercise that right to the detriment of another simply for the sake of exercising it." *Sharp v. Noble Drilling Corp.*, 685 So.2d 608, 611 (La. App. 3rd Cir. 1996) *citing Truschinger*, 513 So.2d 1154 and *M.D. Care, Inc. v. Angelo*, 672 So.2d 969 (La. App. 4th Cir. 1996), *writ denied*, 673 So.2d 1039 (La. 1996); *see also Walther v. National Tea Co.*, 848 F.2d 518, 519 (5th Cir. 1988) (The abuse of rights doctrine imposes "'fault' upon a party who attempts to exercise a right, that he legally possesses, with the intention of harming or imposing a detriment upon another."). "Louisiana courts are loath to invoke the abuse of rights doctrine because its 'application renders unenforceable one's otherwise judicially protected rights.'" *Harrison v. Jones, Walker,* 2004 WL 2984815, *4 (E.D. La. 2004) *citing Lee*, 830 So.2d at 1043; *Massachusetts Mut. Life Ins. Co.*, 549 So.2d at 828.

"If a party has a legitimate and serious interest in exercising a . . . right, he may do so even if it causes harm to another. However, if a party does not have a legitimate and serious interest in the exercise of the right, and to do so would bring unnecessary harm to another, the doctrine of abuse of rights will bar the exercise of the right." *Massachusetts Mut. Life Ins. Co.*,

549 So.2d at 829.  The inquiry is focused on the reasonable belief of the defendant "at the time and in the manner" the right is exercised.  *Lambert v. Maryland Casualty Company*, 418 So.2d 553, 561-562 (La. 1982).  Thus, if at the time of the exercise, the defendant's actions are supported by a  reasonable belief that his or her actions are supported by a legitimate and serious interest, the doctrine of abuse of rights will not bar the exercise of the right.[21] *Id*.

Kenneth suggests that there was no serious or legitimate motive for the defendants' actions, and that the defendants took these actions predominantly to cause him harm. Kenneth has presented no competent evidence to this court to support these assertions. Further, Kenneth has presented no competent evidence to support a conclusion that the defendants acted immorally, unfairly, or in bad faith.  To the contrary, the evidence before this court shows the exact opposite.

As set forth above, in connection with Ronald's obtaining control of the corporation, Ronald and the other defendants did no more than that which the law and the Buy-Sell Agreement authorized them to do. Kenneth was properly removed from the board by majority vote of the shareholders, his mother (who is not a defendant), who at that time controlled the vast majority of the voting stock as trustee and co-trustee of the Helen Trust and the Ralph Trust, cast the deciding votes. [rec. doc. 51-1, Ex. A-9].

---

[21]Disposition of this claim does not involve a subjective determination of the defendant's motive, intent or knowledge.  The record presents no factual dispute as to the events that occurred.  At issue is simply whether a genuine issue of material fact exists regarding whether the defendants' actions under the circumstances presented constitutes an abuse of rights.  This can be determined by examining the undisputed facts in light of the abuse of rights doctrine.

Moreover, the sale of the preferred shares of stock held in the Trusts to Ronald was in accordance with the terms and conditions of the Buy-Sell Agreement. Furthermore, the defendants withheld Leam information from Kenneth because, although he was a director of Leam, he was employed by Strata, a direct competitor of Leam. [rec. doc. 66, pgs. 23-24, 37-38, 46, 79-80].  Accordingly, given Kenneth's dual role, Ronald testified by deposition that he "couldn't see the advantage of taking the risk of a competitor having that information." [*Id*. at pg. 79-80]. His position, under the circumstances, was entirely reasonable.

In sum, Kenneth presents no more than conclusory allegations, unsubstantiated assertions and allegations and assertions supported by no more than only a scintilla of evidence, which is insufficient to defeat summary judgment. *See Little*, 37 F.3d at 1075; *See also St. Germain v. Coulon,* 922 So.2d 627, 630 (La. App. 5th Cir. 2006) (affirming summary judgment on an abuse of rights claim in the absence of documents or proof to support the plaintiff's claim).

Finally, although in their capacities as officers and directors of Leam, Helen, Ronald and Luann each owed fiduciary duties to Kenneth in his capacity as a minority shareholder, all three, Helen, Ronald and Luann, also owed fiduciary duties to Leam.[22] In particular, each had a legitimate interest in protecting Leam from the very real threat posed by Kenneth (and his brother Frank), who was employed by a direct competitor of the corporation's primary subsidiary.  Regardless of whether Kenneth would or, as he now claims, would not act against

[22]Under Louisiana law officers and directors of a corporation owe fiduciary duties to both the corporation and its shareholders.  *See Eckert v. Roux*, 39 So.3d 636, 640- 641 (La. App. 5th Cir. 2010).

the interests of Leam, the defendants, as corporate officers and directors, each reasonably believed that Kenneth did pose a threat to Leam, to which each owed a fiduciary obligation of protection.  Indeed, had the defendants not acted as they did, a strong argument could be made that they had breached those obligations.

Given this legitimate motive, it is clear that the predominate motive underlying the defendants' actions was not to harm Kenneth.  Rather, the defendants' actions were primarily motivated by ordinary legitimate business concerns, namely, that Kenneth's position with Strata could be detrimental to the welfare of Leam.  Of course, Ronald had a serious and legitimate motive for his actions in purchasing the Leam shares from the Ralph Trust and the Helen Trust.  By the purchase of these shares, Ronald became the majority, and therefore controlling, shareholder of Leam.  Even if Ronald's actions harmed Kenneth, Ronald had a serious and legitimate motive.  The exercise by Ronald of his rights was for the purpose of gaining a majority of the shares of Leam, thus keeping the shares of Leam in the family, exactly as contemplated by the Buy-Sell Agreement.

Under similar circumstances, courts have found no actionable claim for abuse of rights. *See Mixon v. Iberia Surgical, LLC*, 956 So.2d 76, 81-82 (La. App. 3rd Cir. 2007) (finding no abuse of rights when members of an LLC voted unanimously to terminate the plaintiff-member when it "became apparent that the animosity which existed between [the plaintiff] and his partners would be detrimental to the welfare of the business venture", thus, the court found the defendants' actions were not "done to cause [the plaintiff] harm or for any other reasons than a

legitimate business reason."); *Johnson v. McAlpine*, 688 So.2d 203, 207 (4th Cir. 1997) (professional law corporation and remaining shareholders which chose not to purchase dissatisfied resigning shareholder-plaintiff's stock pursuant to their Buy-Sell agreement did not constitute an abuse of rights because the doctrine "has no application to this situation where the defendants had a legitimate interest in protecting their law practice and did no more than the law and their contracts with plaintiff authorized them to do.").

Likewise, under these circumstances of this case, this court, as a matter of law, cannot find the abuse of rights doctrine applicable in this case.

For these reasons, summary judgment is properly granted on Kenneth's abuse of rights claim.

## 5. Request for Appointment of a Receiver

Plaintiff, Kenneth, concedes that he is not seeking appointment of a receiver at this time. Moreover, given the above analysis, granting summary judgment for the defendants on Kenneth's claims for corporate mismanagement and fiduciary breaches, the appointment of a receiver is not warranted.  *See Allen v. Royale 16, Inc*., 449 So.2d 1365, 1371 (La. App. 4th Cir. 1984) (noting that receivership is proper only where there is wilful corporate mismanagement to purposefully ruin the corporation); *Thornton ex rel. Laneco Construction Systems, Inc. v. Lanehart*, 723 So.2d 1118, 1123 (La. App. 1st Cir. 1998) (noting that in the absence of a clear showing of fraud or breach of trust, courts should not interfere unless it is manifest that a receiver should be appointed and the appointment would serve a useful purpose).

## **CONCLUSION**

For the above reasons, the defendants' Motion for Summary Judgement [rec. doc. 51] is

**GRANTED.**  Accordingly, this lawsuit is dismissed with prejudice.

Signed this 16th day of February, 2012, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

44